# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

**CASE NO** _____ 15cv62465-Dimitrouleas/Snow

STEVEN FRANKLYN HELFAND,

**COMPLAINT FOR DAMAGES; and DEMAND FOR JURY TRIAL**

*Plaintiff,*

*vs.*

TRAVELERS COMMERCIAL INSURANCE COMPANY,

*Defendant.*

**COMES NOW**, Plaintiff, Steven Franklyn Helfand [hereafter "Helfand"],[1] by and through himself, in *propria persona*, and sues Defendant, Travelers Commercial Insurance Company [hereafter "Travelers"].   Helfand states as follows:

## I.   PARTIES

**A.**   **The Plaintiff**

    1.  Helfand is a resident and citizen of the state of Florida.

**B.**   **The Defendant**

    2.  Travelers is a corporation organized under the laws of the state of Connecticut with a principal place of business in the state of Connecticut.

## II.   JURISDICTION

    3.  This Court has diversity jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C section 1332 (a).  Helfand is a resident and citizen of Florida and Travelers is a Connecticut corporation with its principal places of business in the state of Connecticut.  The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. section 1332(d)(2).

## III.   VENUE

---

[1] Helfand is a member in good standing of the State Bar of California.

4.  Venue is proper in this judicial district pursuant to 28 U.S.C. sections 1391(a); 1391 (b) and 1391 (c).  A substantial part of the events or omissions giving rise to Helfand's claims occurred in this District, and a substantial part of the property that is the subject of the action is situated in this District.  Travelers also routinely conducts business in this District.

## IV.   ALLEGATIONS COMMON TO ALL COUNTS

### A.   Introduction

5.  Travelers wrongfully denied Helfand's insurance claim after Travelers failed to properly consider the implications of the endorsement styled HO-61B (10-06) [the "Valuable Items Plus" endorsement].   Nearly forty-five days after the claim occurred, Travelers claimed not to have known that Helfand's claim involved items of antiques, valuable furnishings, lithographs or anything else within the so-called "Fine Arts" category of the applicable "Valuable Items Plus" endorsement in spite of sending two field adjusters to  examine the loss location, allegedly possessing thirty photographs of the losses and having an  environmental hygienist conduct a "limited wildfire" assessment to determine the presence  of smoke damage.

### B.   Exhibits to the Complaint

6.  Attached as **Exhibit A** is a true and correct copy of the so-called "Declarations Page" for the contract of insurance between Helfand and Travelers.  Helfand's applicable policy number concerning this action is: 994503528 631 1.  Helfand's claim number was: HXF4294.

7.  Attached as **Exhibit B** is a true and correct copy of the so-called "Homeowners - Contents Broad Form HO-4 (10-06)" for the contract of insurance Between Helfand and Travelers.

8.  Attached as **Exhibit C** is a true and correct copy[2] of the so-called "Enhanced Home Package HO-84 CA (06-09)" endorsement for the contract of insurance between Helfand and Travelers.

9.  Attached as **Exhibit D** is a true and correct copy of the so-called "Valuable Items Plus HO-61-B (10-06)" endorsement for the contract of insurance between Helfand and Travelers.

10.  Attached as **Exhibit E** is a true and correct copy of the so-called "Limited Fire Particulate Assessment Report" [hereafter "Report"] issued on October 27, 2015 by Clark Seif Clark, Inc [hereafter "Clark"].  On page 1 of the Clark Report it is clarified that it is, in fact, a "limited wildfire smoke assessment."

---

[2] Helfand hand-wrote the claim number, "HXF4294," on the top of **Exhibit C**.

11.  Attached as **Exhibit F** is a true and correct copy of a supplement to **Exhibit E** on October 29, 2015 by Clark.

12.  Attached as **Exhibit G** is a true and correct copy of a letter denying Helfand's claim from Travelers dated November 13, 2015 [hereafter the "Denial Letter."]

13. Attached as **Exhibit H** is a true and correct copy of photographs Helfand submitted to Travelers documenting the loss.

14.  Attached as **Exhibit I** is a compendium of correspondence between Travelers and Helfand concerning the loss.  **Exhibit I** is paginated "Ex I, ___ " when referencing specific communications incorporated therein.

15.  Attached as **Exhibit J** are photographs of Helfand's building in downtown San Francisco, the building's proximity to downtown and a floor plan of Helfand's unit so as to provide context.

16.  Attached as **Exhibit K** is a true and correct copy of the civil remedy notice served on Travelers by Helfand.

**C.**     **The Loss Location**

17.  Helfand's residence at the time was a rented, studio apartment located in a modern, high-rise building between Market Street and Mission Street in the Van Ness Corridor / South of Market area of downtown San

Francisco, California.  See, *generally*, **Exhibit J**.  Helfand's unit was on the eighteenth floor and was adjacent to three buildings undergoing construction.  *Id.*  It had a so-called "French Balcony" with large exterior doors which typically remained open in light of the fact the building did not have air-conditioning nor any windows which could provide ventilation.  *Id.*; [a picture of the balcony door in relation to the studio is depicted at **Exhibit E, p. 13** [see photo numbers 1 and 2].  Helfand's unit was lushly furnished with valuable antiques, objects of art, etc.  See, *generally*, **Exhibit H** [showing fine furnishings and objects of art damaged in the loss].

D.    **Helfand moves to Florida after being devastated by the loss**

18.  On October 22, 2015 and after the date of loss, Helfand moved from San Francisco, California to Hollywood, Florida and took most of the property with him save for a handful of items.  Helfand pre-cleared his move to Florida with Travelers in advance.  Travelers authorized Helfand's move and indicated the claim would then be reassigned to Florida adjusters as the subject property, personal contents, and Helfand would now be in Florida.  Helfand was enthusiastic about Travelers' agreement to reassign the claim in light of a host of shortcomings with Travelers' assigned claims handlers.

**E.**     <u>**Helfand suffers personal injuries from the loss**</u>

19.  Helfand advised Travelers that Helfand's health was rapidly deteriorating immediately post-loss; Helfand was suffering from headaches, dizziness, nausea, vomiting, skin rashes, canker sores and night sweats. Helfand requested that the contents be professionally cleaned either onsite or offsite to ameliorate the physical ailments.  Helfand indicated he would continue to reside in his apartment in San Francisco, California with the contents (assuming both the unit and contents were professionally cleaned) and/or would be willing to store his property locally if Travelers did not want the move to go forward at that time.  Travelers expressed no objection to Helfand's move.  Helfand could not afford to temporarily relocate within San Francisco and Travelers was unwilling to provide any assistance at any time.  When Helfand advised Travelers that re-location assistance was requested, Travelers stated that Helfand would have to wait until Travelers made a coverage determination.

**F.**     <u>**Helfand moved to Hollywood, Florida and is residing with his parents as Helfand attempts to recover physically, mentally, emotionally and financially from the loss.**</u>

20.  Helfand was growing increasingly weary of Travelers'
ever-changing plethora of groundless and incomprehensible explanations
and delays that were reminiscent of Travelers botched handling of an earlier
substantial claim Helfand made in approximately 2008 which ultimately
settled at policy limits.  Helfand specifically raised the issue of relocation in
the context of an improper denial in light of his familiarity with the
possibility occasioned by past challenges when dealing with Travelers.  John
W. Camp, the assigned, so-called "in-house" claims adjuster for Travelers
[hereafter "Camp"] stated that Travelers would not have any objection to
any civil legal matters originating from Florida as, according to Camp, "it
would make no difference as Travelers is a nationwide company."  As such,
Travelers advised Helfand that he could move with no impact on the claim.
Moreover, Travelers agreed the location of any necessary, subsequent civil
action(s) would be Florida in the event Helfand required civil legal remedies.
Helfand and Travelers also discussed how repairs  likely would be far less
expensive in Florida than in San Francisco and Travelers was amenable to
this concept and agreed to it fully.  In reliance on Travelers' promises on this
subject Helfand went forward with his relocation.  Indeed, in one call with
Travelers, Helfand confirmed his Florida address with Travelers.   Travelers

further indicated that this is "where [it] would be sending the check" and confirmed that the Valuable Items Plus endorsement was dispositive to the claim in Helfand's favor. This was evidently short-lived and Travelers reversed course with no explanation as to sending the promised check. In the meantime, Travelers never once claimed that there was no direct physical damage. Helfand was relying on the promised payment to commence needed repairs and move on with his life and these facts were communicated to Travelers by Helfand. Many of Travelers' false representations were directed after Helfand moved and became a citizen and resident of Florida. Helfand also discussed a variety of other matters as discussed *infra*.

**G.    Any sort of "wildfire" assessment was implausible especially in light of the fact Helfand's loss appeared to have been caused by construction particulates or a building fire.**

21. Contrary to the purported basis of Travelers' denial, Helfand had never claimed wildfire smoke entered his former apartment unit at any time. This is confirmed in the environmental report wherein it correctly states: Helfand "**reports that the property was affected by particulates from construction or a fire at a nearby building**." See, **Exhibit E**, p. 5.

Environmental dust, chemical pollutants and/or construction particulates are, in fact, covered under Fine Arts and Valuable Items Plus endorsement.  See, generally, **Exhibit D**.

**H.**     **Helfand's loss was not subject to any exclusion.**

22.  The loss was not "wear and tear," "deterioration," or "inherent vice."  *Id.*  No other exclusions applied.  In oral conversations, Travelers did not assert that an applicable Fine Arts' or Valuable Items Plus exclusion applied;  rather, there was no direct, physical loss.  These unsupported claims by Travelers were squarely at odds with compelling evidence to the contrary.  *Compare*, **Exhibit G** [Denial Letter of November 13, 2015] and **Exhibit H** [pictures showing damages].  Travelers' baseless assertions, including that there was no damage or that inapplicable exclusions somehow, without ever explaining how or why, applied were provably false and without foundation.

23. Notwithstanding actual facts, the environmental report disclaimed it was merely, "a limited wildfire smoke  assessment." **Exhibit E**, p. 1. Moreover, the "main objective of this investigation was to determine the presence or absence and concentration of particulates including soot, ash, char and burned  debris that can be associated with fires." *Id.*  However,

Travelers failed to address particulates from construction or even a chemical based fire from a nearby building. The "limited wildfire" assessment was inadequate for a host of reasons that seemed obvious, including, for example, that it failed to detect the presence of hair or skin fragments in an apartment Helfand had lived in for nearly seven months prior to the test. See, *generally*, **Exhibit E**. This suggested the results of even the inapplicable test were skewed by the success Helfand had in cleaning certain areas implicated by the loss. The documentable damage included discoloration of the aniline sofa causing it to turn greenish/brown in certain areas that were heavily laden with particulates, discoloration and flaking to polychrome and discoloration and losses to the gilding on a variety of other objects and antiques, etc. The particulates also destroyed the finish on Helfand's dresser.

24. Simply put, the erroneous denial of Helfand's plainly covered claim cannot be squared with prior statements by Travelers on key subject matter. Actual facts, the written environmental report, and countless pictures of the items confirming direct and substantial physical loss to covered property demonstrate Helfand's claim should have been covered. The claimed basis for denial, *to wit*., alleged but foundationless lack of

direct, physical loss ignores or glosses over the actual observable losses and makes no sense.  See, *generally*, **Exhibit H**; **Exhibit I**.  The other theories contained within Travelers' denial letter were unfounded and made no sense. See, *e.g.*, **Exhibit I**, pp. 5-17; **Exhibit I**, pp. 24-27.

**I.** **Travelers all but conceded it had no evidence the damage was anything other than directly caused by Helfand's claimed loss.**

25.  Travelers offered constantly evolving positions on a host of critical subjects including, *inter alia*, damages and coverage that it had previously conceded were, moot, inapplicable or otherwise firmly established.  Towards the conclusion of the claim and in spite of attempting to work with Travelers in good faith, Helfand came to the conclusion he could no longer rely on Travelers' oral representations on any subject and any future communications would need to be written.  See, *e.g.*, **Exhibit I**, p. 29.  All along, Helfand offered to supplement information but Travelers told Helfand not to bother because direct damage to the property was confirmed and accepted although cost of repairs would be open; the only pertinent item of consideration was whether an exclusion precluded coverage.   However, unbeknownst to Helfand, Travelers misfocused on the wrong exclusions. See, *e.g.*, **Exhibit I**, p. 16-17.  This is confirmed by Travelers' non-inclusion

of the Valuable Items Plus endorsement in Travelers' October 29, 2015

email to Helfand.  *Id.*   Helfand asked Travelers to send Helfand all pertinent

documents pertaining to Travelers' tentative denial that was communicated

orally to Helfand.  *Id.*  Travelers' failure to communicate the Valuable Items

Plus endorsement amounted to concealment.

**J.**      **The Valuable Items Plus endorsement should have quickly**

**resolved the claim based on stated and observed facts without the**

**attendant delay occasioned by Travelers.  Travelers' air testing for**

**wildfire contaminants well after the tested areas had been cleaned while**

**ignoring actual physical damages  never made any sense.**

26.  For nearly one month Helfand could not eat in the  apartment and

incurred additional living expense.  Helfand was reasonably afraid the

contaminants were still  present since he was still getting ill whenever

spending any considerable time in the unit.  Helfand was particularly

vulnerable in light of his medical condition and explained this fact to

Travelers and Clark.  Clark explained to Helfand that Clark was merely

responsible for assessing wildfire contaminants; not how those and other

results would be applied to Helfand's medical condition as this was outside

Clark's purview.  Helfand raised this issue with Camp, who, promised to

retain another expert to properly interpret the Clark Report in light of Helfand's medical condition. Camp ultimately admitted Travellers had not done so in spite of its contrary representations and was reneging on its prior commitment to do so. This statement by Camp to hire the expert occurred shortly before Clark inspected Helfand's unit. Helfand raised the issue repeatedly with Camp thereafter. Post issuance of the report, Camp refused to discuss the subject and, whenever Helfand raised the issue, Camp either hung up on Helfand or indicated Travelers was still doing ongoing investigation. Indeed, Helfand specifically told both Travelers and Clark that he was having a variety of allergic reactions that were not present previously. Helfand further indicated his medical conditions were now exacerbated considerably by the external particulates from the loss. Yet, Travelers' refused Helfand's request to clean the debris or contents, hire relevant experts, pay reasonable advances so Helfand could move to a different location, **and/or take prudent steps consistent with mitigating Helfand's injuries and losses**. All this amounted to a breach of contract, fraud, concealment, misrepresentation and the intentional infliction of severe emotional distress.

27.   Rather than deal with the challenges on a practical level and in good faith, Travelers was non-responsive to Helfand.  Travelers' employees mocked Helfand, as discussed *infra*, accused Helfand of causing the loss, repeatedly hung up on Helfand whenever he asked a probing question and refused to communicate with any substance.   All the while Travelers falsely represented to Helfand that it needed more time as it was preparing a substantive response to Helfand's concerns.   See, *e.g.*, **Exhibit I**, p. 1 ["This claim remains open because we are currently in the process of reviewing and responding to your questions in regards to your claim."]   In reality, Travelers failed to meaningfully respond to a single question by Helfand.  The written record speaks for itself.

**K.**   **Travelers intentionally inflicted severe emotional distress on Helfand**

28.   Travelers, through its employee, Camp, mocked Helfand's serious health conditions, calling him three times over a truncated period of time and each time asking "How are you?" and then laughing each time.  This occurred, when Helfand had contacted Travelers, to report that he was becoming seriously ill from the contaminants and needed an emergency advance so that he could re-locate.  If Camp was attempting to make light of

Helfand's condition, the "joke" fell flat. When Camp related the oral denial of the claim, Camp giggled repeatedly as if the denial was a joke. It sure was! As if to underscore the point, when Camp emailed Helfand to transmit the denial letter, Camp indicated "**Thank you for choosing Travelers for your insurance needs. Have a great day!**" See, e.g., Exhibit I, p. 34-35.

29. In the meantime, Helfand was waiting for the environmental report which Camp had promised to "rush" given Helfand's ongoing physical ailments all of which arose post-loss. Helfand contacted Clark to try and get the report earlier and Clark revealed that Camp had elected not to "rush" it because this would entail extra expense. When Helfand contacted Camp to express his surprise that the Clark Report, had not, contrary to Camp's earlier statements, been rushed, Camp dismissed Helfand's concerns and indicated that it would "cost too much money." Helfand had been led to believe Travelers was treating the matter as urgent. However, the first indication to the contrary occurred prior to the hiring of Clark. Helfand learned Travelers elected not to move forward with the original environmental testing service Camp selected because that service had promised to conduct far more extensive and rigorous investigation than Clark after Helfand disclosed his concerns.

**L.      The Denial Letter misrepresents the particulates was merely
"every day (sic) dust," whatever this is.**

30.  Hoping to have a second look taken at the wrongful denial of
Helfand's claim, Helfand spoke with Peggy Stephens [hereafter "Stephens"]
and Keith Pearman [hereafter "Pearman"], management and supervisory
employees for Travelers, respectively, on or about October 30, 2015 about
the alleged basis of denial.  Tellingly, Stephens had no criticism of the
substance of Helfand's discussion.  Travelers did not object or take  issue
with any fact or issue related by Helfand, including, *inter alia*, the
shortcomings of the investigation.  Notwithstanding these facts, Stephens
asserted the denial still stood with no explanation.  See, *e.g.*, **Exhibit I**, p.
20.5 [refusing to shed any light and stating merely "Our decision remains
unchanged."]  Stephens did not take issue with the fact Travelers considered
the  wrong endorsement or explain how or why this happened when
Travelers, Camp, Pearman and Stephens were all purportedly involved in
this claim in some manner.  Stephens could not explain the presence of

damages and terminated the call.  Many facts appeared to have been overlooked or were at odds with the stated basis of denial.[3]

## M.    **Stephens and Travelers conceded that Travelers had no facts justifying the improper denial of Helfand's claim.**

31.  Travelers' Denial Letter and its inadequacy speaks for itself.  See, *e.g,* **Exhibit G**; **Exhibit I**, pp. 24-28.  After attempting to explain what had occurred in detail, Helfand was chastised by Stephens for taking too long (about five minutes or so).  For no genuine reason whatsoever, Stephens then hung up on Helfand shortly after Helfand asked whether Travelers would submit to policy appraisal.  Stephens gave two inconsistent answers.  Pearman then stated "no," presumably because Travelers did not challenge Helfand's stated value of  damages while arguing there was no "direct, physical loss."  The call was then terminated by Stephens much to Helfand's chagrin, while Helfand was in mid-sentence.[4]

---

[3] Helfand attempted to contact the Travelers' consumer affairs ombudsman who promised a return telephone call from a senior manager but was never contacted by Travelers.  When Helfand contacted consumer affairs a second time, consumer affairs indicated that there was nothing more it could do.

[4] Stephens also criticized as  "excessive" the four voicemail messages Helfand left over a two day period, one of which introduced Helfand and all of which simply requested the courtesy of a return telephone call given this urgent  situation warranting immediate management attention.  Helfand had made four other telephone attempts  but had not left messages as not be a bother.

32.  Rather than discuss specifics or the substance of the Fine Arts or Valuable Items Plus endorsements or damages, Stephens criticized Helfand's alleged "tone," whatever this means.  Helfand was civil and professional at all  times while Stephens was rushed, dismissive and impatient.  This was unfortunate.  Stephens' misfocus on issues of imagined "tone" were invented simply to avoid further oral  communications.  Travelers engaged in a pattern of diversion and concealment.   For example, Helfand requested that Travelers immediately email Helfand all photographs Travelers purportedly relied upon showing the purported absence of damage.  See, *e.g.*, *generally*, **Exhibit I**.  When Helfand offered to provide Travelers with an itemization of losses along with pictures and repair estimates, Travelers declined, again indicating, as noted *supra*, the coverage decision was the sole focus and that the extent of damages would be determined later.  The same was true for a sworn statement of loss.  These statements were made by Stephens and Camp on or about October 30, 2015.  The statements were fraudulent and designed to purposefully mislead Helfand.  Travelers' approach was fundamentally flawed and outright dishonest so as to create a pretextual basis for denial of Helfand's claim.

---

33.  In response to Helfand's email sent shortly after the telephone call terminated and asking, "if there was  no direct damage how do you explain the sofa discoloration," Stephens wrote: "**It would be  impossible for many of us involved to reach a conclusion with respect to why your couch may have discoloration. My knowledge is limited it could be a number of things such as the  sun, personal spill, etc. That would be why we rely on experts.**"  See, **Exhibit I**, p. 15.

34.  However, Travelers never retained an expert to provide the knowledge as to how key aspects of the loss should be evaluated.  It was plain that Stephens and Travelers had no candid explanation and identified no facts and/or experts establishing the damage was not a direct, physical loss.  Moreover, Stephens and Travelers were engaging in unfounded hypotheticals since there was no spillage in spite of, in essence, blaming Helfand for the loss.  *Id.*  While aniline leather may fade from the sun over a period of time it does not turn a chemically,  non-aniline-like green/grey and brownish.  The aniline in certain areas felt hardened.  Had Travelers genuinely  studied the photographs Travelers claims to have taken to show the inexistence of direct, physical loss, Travelers would have found ample evidence to the contrary.  The absence of particulates related to  a fire did

not alter Helfand's coverage.  It did not modify the obligation of Travelers to

cover losses caused by, for example, non-fire related particulates.  The

written environmental report was of no genuine support for Travelers

coverage denial, as, it only concluded there was no discoloration caused by

"soot."  The Clark Report confirmed discoloration but left open the cause

save for presumably wildfire related particulates.

35.  Compounding the inadequate investigation, Travelers did not

retain, for example, an  upholstery, cleaning or antiques expert(s).  Even

worse, the test sample in the environmental  report was taken from a cleaned

area of the sofa that had not turned green.  Neither Stephens nor Travelers

had any evidence to back up their baseless assertions and Helfand did not

have to  disprove a negative to obtain coverage.

36.  As to, for example claimed "sun damage" to the sofa, Stephens

ignored, among other factors, that directly behind the sofa was the leather

embossed panel which served for purposes of privacy and blocked the sun

from hitting the sofa.  Travelers implicitly suggested Helfand was

misrepresenting the origin and cause of the loss.

**N.** **Travelers had instructed Helfand to clean the surfaces of items**

**given the health problems Helfand was suffering from the particulates.**

## **Helfand also sought to mitigate his damages given Travelers' inattentiveness.**

37.  Travelers confirmed Helfand was not neglectful or negligent in cleaning or maintaining Helfand's contents.  Travelers, in essence, sought to benefit from, for  example, Helfand's cleaning and the attendant delay associated with the Travelers' misconsideration of what were inapplicable endorsements.  Travelers sought to use Helfand's mitigation efforts to avoid covering the underlying damage directly caused by the loss and that became plainly visible after cleaning.   Cleaning the debris and particles, of any origin, was Travelers job, not Helfand's.  Helfand, nevertheless, attempted to do so because these objects were his treasures.  Travelers contended, that in light of its limited knowledge, experts should guide any analysis and made this representation to Helfand.  See, **Exhibit I**, p. 15.  But if experts were required, Travelers failed to retain more than the  hygienist to do a limited wildfire investigation and misrepresented the scope of its evaluation.  Had, for example, the green discoloration been thought to have come from the sun or spillage why not, for example, retain an upholstery expert?   Why not test the actual damaged upholstery? Why not even photograph it or ask questions before  issuing the denial?  Instead, Travelers substituted conjecture for

actual facts, hypotheticals  unsupported by analysis for persuasive contrary

evidence, and suggested Helfand was is, in  essence, less than forthright or

caused the damage himself.

**O.**     **Travelers failed to consider the proper endorsement.  Travelers**

**orally communicated Helfand's claim was denied due to an inapplicable**

**exclusion and not the absence of direct, physical loss.  Inexplicably, in**

**spite of acknowledging this error, Travelers nevertheless relied on**

**improper endorsements in formally denying Helfand's claim on**

**November 13, 2015.**

38.  The continued, misplaced rote reliance on erroneous and easily

refutable basis for denial made no sense.  The Fine Arts and Valuable Items

Plus coverage was only realized by Helfand after Helfand obtained a full

copy of the policy from Helfand's independent agent, Geico.  Travelers' had

refused the repeated requests by Helfand to provide a certified copy of the

policy and all endorsements.  Initially, Helfand was relying on Travelers'

representations, as to the scope of coverage, and Travelers' representations

turned out to have been false.  See, *e.g.*, **Exhibit I**, p. 17.  In doing so,

Travelers failed to send Helfand a certified or the "Valuable Items Plus"

endorsement, so as to attempt to improperly rely on incomplete materials

and misrepresent applicable coverages to Helfand.  For over forty days,

Travelers failed to consider the correct  endorsement, delayed payment of

benefits and sought to find an exclusion that Travelers should have  known

was moot by way of Valuable Items Plus endorsement in its fraudulent

course of conduct to rely on inapplicable endorsements.  Travelers

explanation that Travelers did not know the Valuable Items Plus

endorsement applied made no sense under the circumstances and was false.

However, even when the mistake was conceded by Camp and Travelers,

Travelers continued to ignore the endorsement and refused to apply it.

During prior conversations with Helfand, Travelers conceded that it did not

apply or consider the implications of the endorsement because Travelers

inexplicably failed to realize that Helfand's claim involved items of

antiques, valuable furnishings, lithographs or anything else within the fine

arts category.  Fine Arts are subject to the $50,000 limitation, but contents

protected pursuant to Valuable Items Plus is based on the full amount of

contents protection, far in excess of this amount.  This was not a minor point

to be swept under the carpet, as the endorsement provided far broader

coverage to Helfand than Travelers let on.  So as to try and defeat coverage

by concealment, Travelers claimed to possess 30 photographs showing the

inexistence of damage. But if Travelers had all these photographs it would or should have known that fine furnishing and valuable items were involved in the claim.

39. In sum, Travelers conceded that it failed to take into account the Valuable Items Plus endorsement and this is confirmed by Camp's non transmittal of the endorsement to Helfand while claiming other endorsements controlled the outcome.  This assertion by Camp was false. Moreover, Travelers' tentative denial was not  based on lack of direct physical damage and Travelers changed its theory to counter anything presented, even by Travelers' utilization of fraudulent theories that were erroneous and patently nonsensical.  Travelers' fraudulent scheme was intentionally calibrated to try and conjure up any basis, however groundless, to try and defeat coverage or alternatively wear Helfand down into submission.

40. Travelers assertion, through Camp, that Fine Arts only encompassed "hanging wall art" on or about October 30, 2015 was erroneous and purposefully false so as to stifle Helfand's valid claim. Travelers only  conceded the point when Helfand read Camp the

endorsement verbatim.  Camp belatedly agreed the endorsement applied, but then, inexplicably failed to apply it.

41.  Even more inexplicable, when Travelers outlined its tentative denial of the claim, it stated that  somehow, at least according to Travelers, denial of Helfand's claim was tied to payment of an invoice on the environmental test.  After being presented with the proper endorsement, Travelers' then reversed course, claiming the  damage to Helfand's property, Travelers had earlier conceded, somehow did not occur or was caused by Helfand.  This was sleight of hand.   If, for example, Travelers explanations for not considering the correct endorsement were genuine, how was it then possible for Travelers to appraise and adjust the loss if Travelers did not even know what the items were or what they should even look like?  The applicable endorsement was listed in the declarations page.  The items were allegedly depicted in  the photographs [including those provided by Helfand], were the specific subject of prior discussions concerning investigation scope  and expert retention and repair and whether the hygienist tests could damage the wood, gilding  and/or polychrome. Travelers knew because Helfand told them.  This was not new information learned at the  eleventh hour by Travelers.  The simple fact of the matter is

that when Travelers sent a field adjuster, Jonathan Herr [hereafter "Herr"], to visit the property Herr commented on the visible damage caused to the gilded items, the sofa, collection books, chairs, screen, masks, etc. Herr specifically told Helfand, among other things, the existence of direct damage was not in dispute; rather the analysis depended upon whether the cause of the damage was the subject of exclusion. This was consistent with what Travelers said all along until it sharply reversed course on the dubious grounds discussed herein. When, for instance, Helfand showed Herr, an artistic, paper mask that Helfand purchased in a gallery in Rome years ago Herr commented "that's a shame" in referring to the loss and resultant damage. For Travelers to then claim the loss did not occur, or was occasioned by "every day (sic) dust," was outrageous and despicable especially when juxtaposed with Travelers' omissions, actions, and fraudulent conduct.

**P.**     **Travelers states that it intended to deny Helfand claim before Travelers completed its own investigation.**

42.  In spite of Travelers admitted incompletion of review Travelers, still threatened to send Helfand the "denial when it is completed." See, *e.g.*, **Exhibit I**, p. 30; **Exhibit I**, p. 32.

## V.   CAUSES OF ACTION

**A.**   **COUNT I: BREACH OF CONTRACT**

43.  Paragraphs 1 through 42, above, are incorporated herein.

44.  Travelers entered into a written agreement with Helfand, in which it agreed to insure against a variety of perils.  See, **Exhibits A; B; C** and **D**.

45.  The written contract and applicable endorsements are attached in aforementioned exhibits at **Exhibits A; B; C** and **D**.

46.  Helfand performed, or substantially performed/complied, with all conditions and conditions precedent.  Helfand, for example, paid his premiums as requested, made accurate representations when he procured his insurance, timely tendered his insurance claim and cooperated with Travelers' investigation.

47.  Travelers materially breached the contract as follows:

A. It failed to pay policy benefits owed to Helfand as a result of a covered loss.

B. It failed to consider and apply the endorsement styled "Valuable Items Plus."  Instead, Travelers based its denial on exclusions that were inapplicable, baseless or otherwise moot.

C. Putting aside its failure to properly consider and apply the correct endorsement, Travelers failed to apply the "Enhanced Home Package" HO-84 (06-09) properly.

D. Even when the inapplicability of relied upon endorsements was raised with Travelers both orally and in writing, it refused to acknowledge or address, much less consider and apply, the proper endorsement.

E. Travelers refused to agree to appraisal as provided in Section 1 condition of the policy HO-4 (10-06), p. 13, paragraph 7.

F. To the extent Fine Art's coverage is vague and ambiguous coverage should have been determined in favor of Helfand by Travelers. For example, it is, *arguendo*, vague as to whether the only exclusions with respect to those items categorized as "Fine Arts" are those contained within HO-61-B (10-6) p. 1, subdivision "Exclusions," paragraph 4. The subdivision of this endorsement states: "As respects Fine Arts: (a) Loss resulting from any repairing, restoration or retouching process; (b) Loss to property on exhibition at fair grounds or on the premises of any national or international exhibition; (c) The first $100 of loss due to breakage of art glass windows, statuary, marble, glassware, bric-a-brac, porcelain and

similar fragile articles, unless caused by fire, lightning, aircraft, theft and/or

attempted theft, cyclone, tornado, windstorm, earthquake, flood, explosion,

malicious damage, or collision or overturn of conveyance; (d) Loss to

cemetery property."  When Helfand demanded explanations as to the scope

of the coverage, Travelers claimed it was "responding" to Helfand's queries

but never did with any meaningful specifics.  See, *e.g.*, **Exhibit I**, p. 1.

   G. Even if the exclusions at subdivision, "Exclusions,"

Paragraphs 1, 2, 3, 5, 7 8, and 9" applied to "Fine Arts," which they do not,

Travelers was still obligated to cover the peril that occurred.  See, Valuable

Items Plus endorsement, subdivision "Exclusions," p. 2 ["SECTION I -

EXCLUSIONS do not apply to the coverage provided in this endorsement."]

   H. The November 13, 2015 Denial Letter states as follows:

"The State of California requires us to provide the following information.

[P] Our position: This letter reflects the company's final position regarding

this claim.  Our decision is based upon the information and documentation

we received in connection with our research of this claim.  If you are aware

of any new or different information that might lead to us to reconsider our

decision,  please contact us immediately."  However, when Helfand did so to

ascertain what specific information Travelers' purportedly relied upon,

Travelers was coy and conclusory, unwilling to share information so that Helfand could even ascertain what information, was considered or weight given.

I.   While char, soot and ash were found to be in so-called "background levels," Travelers failed to square these levels with Helfand's existing medical condition that was disclosed to Travelers.  **Exhibit F**. Travelers had promised to retain an expert to do so but then failed to comport with this representation, promise and agreement.

48.  Helfand suffered damages, as a direct and foreseeable consequence of Travelers' material breach of contract, in an amount according to proof at trial.

**B.**   **COUNT II:  FRAUD - CONCEALMENT - MISREPRESENTATION**

49.  Paragraphs 1 through 42, above, are incorporated herein.

50.  Travelers made false statements concerning material facts or concealed such material facts and engaged in a pattern of fraudulent conduct. These fraudulent acts were orchestrated so as to unreasonably delay and wrongfully deny coverage to Helfand.  Alternatively, Travelers sought to craft a pretextual basis on which to unreasonably delay and wrongfully deny coverage to

Helfand. The allegations of fraud and concealment are reflected above but several
are worth highlighting:

    A. **Exhibit I**, p. 17.5.  Email from Camp to Helfand at 10:42
       a.m., October 29, 2015:  "Per your request, please see your
       attached policy and endorsement which would apply to the
       loss."  Camp attached **Exhibits B and C**.  Camp omitted and
       concealed **Exhibit D**.  Camp misrepresented the coverages
       and exclusions and used this to procure delay and denial to
       Helfand's material detriment.

    B. **Exhibit I**, p. 15.  Email from Stephens to Helfand at 6:44
       p.m. on October 30, 2015.  "That would be why we rely on
       experts."  [discussing how Travelers went about determining
       spillage or sun damage].  However, Travelers never retained
       such experts.  Travelers only had one retained expert, the
       hygienist from Clark.  The statement was crafted so as to
       mislead Helfand into believing Travelers' investigation was
       far more comprehensive than it was in actuality.

    C. **Exhibit I**, p. 1, Letter from Travelers and Camp to Helfand
       on November 12, 2015.  "This claim remains open because

we are currently in the process of reviewing and responding to your questions in regards to your claim." These statements were false. The written record confirms Travelers never substantively responded to any of Helfand's questions. By November 12, 2015, Travelers had already communicated that was denying Helfand's claim. By no means was the claim "open" and this was crafted so as to mislead Helfand.

D. **Exhibit I**, p. 18, Email from Stephens to Helfand at 11:20 a.m. on November 16, 2015. "Travelers position has always been to look for coverage. While we appreciate the theories you have presented, based on the facts as we know them, there is no coverage and our decision will not change." If Travelers statements were factual, Travelers would not have ignored **Exhibit D**. Helfand presented no theories. Travelers had no facts that it "knew." Travelers was concealing its lack of information to support a pretextual denial through fraudulent artifice to try and wear Helfand

down.  Travelers, on the contrary, had ample information

from which to find coverage in favor of Helfand early on.

E.  **Exhibit I**, p. 22, Email from Stephens to Helfand at 12:27

p.m. on November 16, 2015.  "We have responded to you

repeatedly."  This statement was false and this is

ascertainable merely through review of the written record.

No substance was ever provided.  Travelers' purported

"responses" were "nonresponsive."

F.   **Exhibit I**, p. 22, Email from Stephens to Helfand at 12:27

p.m. on November 16, 2015. "I am that person and I have

reviewed the facts of your claim thoroughly and feel

confident in the outcome reached."  Stephens did not engage

in a thorough review and sought to mislead Helfand as to the

true extent of the review and/or conceal its actual limited

scope.

G.  **Exhibit G** drafted by Camp and sent to Helfand on

November 13, 2015 [one day after Travelers indicated the

claim was still open and it was responding to Helfand's

claim.]  The entire second paragraph is false.  Helfand

presented a claim for additional living expense and the cleaning of his unit in addition to contents.  Second sentence is false.  Helfand never stated anything about an "emission." The Clark Report correctly recounts what Helfand reported. Helfand never stated "smoke or emission" made its way into Helfand's unit.  The assertion that Travelers' research found that damages with regard to smoke and emissions could not be confirmed is false.  The smoke testing was limited to a wildfire assessment.  See, *e.g.*, **Exhibit E; F**.  Clark did not test for emissions and no other expert did either.  The statement "they [referring to Clark] have confirmed that the substance in questions (sic) is in fact (sic) every day (sic) dust that is found in an every day (sic) home" is totally false. See, *e.g.*, **Exhibits E, F, and I**, p. 26.   The statement "Since there is no direct physical loss to your personal property, your policy does not provide coverage" is false.  *Compare*, **Exhibit H**.  The Denial Letter conceals **Exhibit D** and the applicable exclusions.  Travelers misrepresents the applicable exclusions in **Exhibit G**.  The statements found at

**Exhibit G**, p. 2, second paragraph are entirely false and nonsensical.  San Francisco public transport is for the most part "zero-emissions" making the claim recounted both silly and false; it did not occur.  See, generally, **Exhibit I**, pp. 24-27 [Helfand discussing Travelers' various misrepresentations contained within the denial letter].

51. Travelers knew the statements it made were false when it made them or made the statements knowing it was without knowledge of its truth or falsity.  Alternatively, Travelers was obligated to disclose information Travelers' improperly concealed and withheld.

52.  Helfand relied on the false statements or acted detrimentally in light of Travelers' nondisclosure and concealment; and

53.  Helfand suffered loss, injury and/or damage as a result.

**C.     COUNT III: INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS**

54.  Paragraphs 19, 20, 25-29, 30-42 above, are incorporated herein.

55. Travelers conduct proximately caused the deliberate or reckless infliction of mental suffering purposefully directed at Helfand.

56.  Travelers conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

57.  The conduct caused the emotional distress, and

58. The emotional distress was severe.

**D.**    **COUNT IV: NEGLIGENCE - PERSONAL INJURY**

59.  Paragraphs 19, 26 29 and 30 are incorporated herein.

60.  Travelers had a duty or obligation, recognized by the law, requiring it to conform to a certain standard of conduct, for the protection of Helfand against unreasonable risks.  These duties included, *inter alia*, those encompassed by **Exhibit K,** those contained in **Exhibits A, B, C** and **D** and those Travelers took upon itself through its own representations; *to wit*, warranting to Helfand that Travelers would perform certain specific tasks causing Helfand to act in justifiable reliance on such representations.

61.  Travelers' failed to conform to the standard required, *i.e.*, triggering a breach of duty.  In this regard:

A. Travelers failed to pay policy benefits owed to Helfand as a result of a covered loss.  Travelers breached its insurance contract with Helfand.  In so doing, Travelers occasioned actual personal injuries to

Helfand related to or arising from the loss. For instance, Travelers was obligated to clean or otherwise cover Helfand's unit and contents consistent with **Exhibits A, B, C** and **D**. Concerned about health implications, Helfand immediately disclosed his medical condition to Camp and indicated his body was highly vulnerable to contaminants. Helfand stated specifically to Camp in his first conversation that when attempting to clean certain surfaces, his hands were breaking out in rashes and he was suffering from a variety of other ailments, including coughing and wheezing, immediately post-loss and nonexistent prior to the loss. Helfand explained the particulates were compounding his existing medical conditions. Helfand was feeling physically ill whenever Helfand spent considerable time in the unit post-loss. Camp dismissed Helfand's concerns and indicated the carrier would do nothing substantive for Helfand until coverage was determined. Travelers and Camp refused Helfand's request for an advance. Travelers and Camp refused Helfand's request, to, for example, provide a professional cleaning service or reimburse Helfand for cleaning supplies or costs incurred.

      B. The November 13, 2015 Denial Letter states as follows: "The State of California requires us to provide the following information. [P] Our position: This letter reflects the company's final position regarding

this claim. Our decision is based upon the information and documentation we received in connection with our research of this claim. If you are aware of any new or different information that might lead to us to reconsider our decision, please contact us immediately." However, when Helfand did so to ascertain what specific information Travelers' purportedly relied upon, Travelers was coy and conclusory, unwilling to share or concealing information Travelers, was, in fact, obligated to share or disclose. In doing so, Travelers precluded Helfand from ascertaining what information, if any, Travelers considered and the weight applied to such information. This served to prevent Helfand from meaningfully evaluating the information, particularly within the contours of pressing medical concerns.

      C. Travelers attempted to rely on "phantom" evidence to try and defeat coverage all the while subjecting Helfand to actual injuries and risk and/or increased risk of future personal injuries. When queries were directed to it, Travelers failed and/or refused to shed light on its so-called "evidence" in any meaningful or non-conclusory fashion. Travelers sought to unreasonably delay and wrongfully deny Helfand's claim. Travelers then sought to create evidence, that, in fact, did not exist to try and support its impermissible denial of Helfand's claim, even going so far as to suggest that

Helfand caused the damage.  See, *e.g.*, **Exhibit F** [failing to properly square so-called "background levels" with Helfand's stated medical condition or "as was" condition before loss].  See also, **Exhibit I**, *generally* [discussing how Stephens sought to blame spillage presumably by Helfand].

J.   While char, soot and ash were found to be in so-called "background levels" tested by Clark, Travelers failed to square these levels with Helfand's existing medical condition.  Travelers had promised Helfand that it would retain a suitable expert to evaluate the Clark Report within the contours of Helfand's medical condition but then reneged.  This ignored the fact that Travelers had agreed to do so and Helfand acted in detrimental reliance on this agreement.

K. Travelers instructed Helfand to clean the property without knowing what the particulates were or the risks or injuries such particulates would cause to Helfand's health.  See, *e.g.*, Paragraph 37 *supra*.

L.  Travelers continued to misrepresent the Clark Report. Travelers' claim that particulates found amount to so-called "every day (sic) dust" in an "every day (sic)," whatever this means, is unsupported.  See, *e.g.*, **Exhibit G**; *Compare*, **Exhibit E, F, and H**.  When Helfand queried Travelers from where these erroneous conclusions were drawn, Travelers

declined to answer or engaged in diversion.  Suffice it to say, neither

conclusion is contained within the Clark Report or the Supplement.

Travelers' assertions appear to have been crafted so as to downplay

Helfand's loss and personal injuries.  In doing so, Travelers compounded

them.

62.  There was a reasonably close causal connection between the

conduct asserted here and Helfand's resulting injury (proximate cause and

cause in fact); and

63.  Helfand suffered actual injuries, loss and damage.

## VI.    **PRAYER FOR RELIEF**

**WHEREFORE**, Helfand prays:

A. That the Court adjudge and decree that Travelers breached its contract with Helfand;

B. That the Court adjudge and decree that Travelers committed fraud;

C. That Helfand recover compensatory damages;

D. That Helfand recover incidental damages;

E. That Helfand recover consequential damages;

F. That Helfand recover statutory damages;

G. That Helfand recover punitive damages;

H. That the Court awards Helfand fees and costs as provided by law;

I. That the Court award Helfand prejudgment and postjudgment interest as permitted by law, and that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action; and,

J. That the Court award Helfand such other further relief as may be deemed necessary and proper.

## VII.   <u>JURY TRIAL DEMAND</u>

Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted,

Dated: November 23, 2015

Steven Franklyn Helfand
*In propria persona*
1400 SW 137th Avenue, Apt. F112
Hollywood, FL 33027
Telephone:  415.397.0007
Email:        sh4078@gmail.com